UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**CORIENA R. HANKE**,                                   Civil Case No. 3:12-CV-00598-KI

                    Plaintiff,                          OPINION AND ORDER

        v.

**COMMISSIONER, Social Security**
**Administration**,

                    Defendant.


        Karen Stolzberg
        11830 SE Kerr Parkway, #315
        Lake Oswego, OR 97035

                Attorney for Plaintiff

        S. Amanda Marshall
        United States Attorney
        District of Oregon


Page 1 - OPINION AND ORDER

Adrian L. Brown
Assistant United States Attorney
1000 SW Third Ave., Suite 600
Portland, OR 97201-2902

Jeffrey R. McClain
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Suite 2900 M/S 221A
Seattle, WA 98104-7075

      Attorneys for Defendant

KING, Judge:

Plaintiff Coriena Hanke brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying plaintiff's application for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"). I reverse the decision of the Commissioner and remand for a finding of disability.

## BACKGROUND

Hanke filed applications for SSI and DIB on May 6, 2008, alleging disability beginning April 4, 2008. The applications were denied initially and upon reconsideration. After a timely request for a hearing, Hanke, represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on January 13, 2011.

On January 25, 2011, the ALJ issued a decision finding Hanke not disabled within the meaning of the Act and therefore not entitled to benefits. This decision became the final decision

Page 2 - OPINION AND ORDER

of the Commissioner when the Appeals Council declined to review the decision of the ALJ on February 8, 2012.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007), cert. denied, 128 S. Ct. 1068 (2008); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of

impairments. A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past. If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. Parra, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). Substantial evidence is more than a "mere scintilla" of the evidence but less than a preponderance.

Id.  "[T]he Commissioner's findings are upheld if supported by inferences reasonably drawn from the record, and if evidence exists to support more than one rational interpretation, we must defer to the Commissioner's decision." Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1193 (9th Cir. 2004) (internal citations omitted).

**THE ALJ'S DECISION**

The ALJ identified Hanke's left arm and bilateral leg fractures, as well as her Asperger's syndrome, as severe impairments.  However, the ALJ found these impairments, either singly or in combination, did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  He concluded Hanke was limited to sedentary work, with no interaction with the public and only superficial interaction with co-workers.  She was limited to understanding, remembering and carrying out short and simple instructions and should work in a job where accuracy was more important than speed.

**FACTS**

Hanke, who was 45 years old at the time of her onset date of disability, has a high school diploma.  After high school, she attended Portland Community College for a short time, working toward a certificate as a specialized teacher's aid, then attended Western Business College where she obtained a diploma in data entry.  She then performed work for a temporary agency.  She spent five years (from 1993 to 1998) delivering pizzas for Pizza Hut, where she received employee of the period three times, until a car accident caused her insurance rates to rise.  During this time, she purchased her own condominium and lived there by herself, but her parents and uncle helped her pay for it.  After her car accident, she transferred to another store where she made dough; she testified

the job "just fizzled out once I switched from being a driver to a dough maker." Tr. 49. She testified she had no trouble getting to work on time. This was her only period of substantial gainful activity.

She next worked as a sales associate at J.C. Penney for a year and a half but was fired for being late to work too often. She rang a bell for Salvation Army during the Christmas season for seven years, and delivered newspapers for the Oregonian for four years until she injured her leg tripping on a sidewalk. With the exception of the Salvation Army, she did not work for the next two years. She then returned to delivering newspapers until she was involved in a head-on vehicle collision two years later on April 4, 2008.

As a result of the April 2008 car accident, Hanke broke her left arm, both ankles and both legs; she required surgery on her right leg and three surgeries on her left leg. She lived with her parents while recovering from the accident. As of October 2009, the fractures had healed, she reported no pain at rest, and pain of 3 out of 10 with prolonged weight bearing. She was taking no pain medications. However, she used a cane for walking distances, inclines and stairs. She was obese and diabetic.

Three months after her car accident, the Oregon Department of Human Services referred Hanke to Donna Wicher, Ph.D., for an intellectual assessment. At that time, Hanke was confined to a wheelchair and both of her legs were in immobilizers, and she complained of depression, fatigue, fearfulness, and stress. Hanke was on time for the appointment; her mother accompanied her. Her physical condition was such that her mother was bathing her, but she reported only bathing about once a week before the accident. Dr. Wicher's testing revealed Hanke's average intellectual ability, but a statistically significant difference between her Verbal and Performance I.Q. scores. The doctor noted mild difficulties in performing activities of daily living, including some neglect of

hygiene needs. Dr. Wicher opined, "Ms. Hanke's mild deficits in her ability to perform activities of daily living, moderate deficits in social functioning, and mild deficits in concentration, persistence, and pace represent the primary psychological barriers to returning her to full-time, sustained employment." Tr. 406. Dr. Wicher thought Hanke's psychological difficulties, in combination with her physical problems, "could potentially make it more difficult for her to obtain and sustain employment." Id.

Jane Starbird, Ph.D., conducted a psychodiagnostic examination of Hanke in December 2008. She was fifteen minutes late for the interview and Dr. Starbird had to interrupt Hanke because she was too slow in filling out forms. She informed Dr. Starbird that, before her accident, she procrastinated about bathing, that it took her 1 and 1/2 hours to bathe and dress, and that she did not see the need to bathe when she delivered newspapers. Her hair was in need of washing. She reported performing her own chores before the accident, but that she did them slowly. Dr. Starbird noted the following:

> Affect was serious, restricted and not always consistent with the content of the speech. She described difficult circumstances with an absence of expected distress. There were frequent lengthy delays between questions and her responses. She seemed to have difficulty deciding how to respond to questions. Responses were brief and quite vague. She usually responded in generalities. She was a limited historian. Her social skills were poor. She was not well-engaged in the interview and in fact, at times seemed indifferent to the process. She was polite however. Her attention and focus would be considered only moderate. Her vocabulary and use of language were good. Her speech was very slow paced but otherwise within normal limits for intelligibility, fluidity, volume and tone.

Tr. 502. Dr. Starbird spoke with Hanke's father separately, who reported he collected money from her insurance company for her because she neglected to do so, he intervened and stopped a foreclosure of her condominium, and he and his wife loaned her money over the years. He also

reported that he learned Hanke was sleeping in her car in her uncle's driveway (after dropping him

off) or in front of her condominium.  He was concerned about his daughter's hygiene and believed

she had lost jobs because of it.  Based on the limited information at hand, Dr. Starbird diagnosed

Schizoid Personality Disorder.  She described Hanke's "presentation and participation" in the

interview as "unusual."  Tr. 503.

Hanke began vocational counseling through Oregon's Department of Vocational

Rehabilitation in December 2008.  After two years of counseling and training, Sandra L. Brown,

M.S., CRC, opined that Hanke is "motivated, has basic clerical skills, and is very detail oriented"

but any job would "have to be with an employer who values quality over quantity, in a position that

is very routine, repetitive, well-defined, requires little or no interpersonal interactions, and that is not

fast paced, nor has production quotas."  Tr. 749-50.  Brown questioned whether Hanke could

"tolerate full time work" and expected that any work she obtained would not meet substantial gainful

activity standards.  Tr. 750.

At Brown's request, Robinann Cogburn, Ph.D., evaluated Hanke in June 2010.  Hanke was

twenty minutes late.  She told Dr. Cogburn she did not think she was affected by any mental or

emotional problems, but did recognize she had problems performing tasks quickly.  She reported

caring for an intellectually disabled uncle, earning $15 a day to set up his medications, drive him to

activities and appointments.  Dr. Cogburn commented that Hanke's speech contained "long latencies

and lack of affective expression . . . . Some questions were followed by very long pauses . . . . When

she answered the questions, however, it appeared that she was feeling concerned about being judged

and sometimes resentful about being questioned."  Tr. 722.  Testing revealed average intellectual

functioning, but weak processing speed. Dr. Cogburn diagnosed Asperger's Disorder and Cognitive

Disorder NOS (deficit in processing speed), opining that Hanke's perfectionism might interfere with job performance.  Nevertheless, Dr. Cogburn noted Hanke had been able to maintain part-time employment on a regular basis, and that her academic skills were strong.  Dr. Cogburn recommended a job "where accuracy is valued over speed."  Tr. 725.

Luahna Ude, Ph.D., a licensed psychologist for the Vocational Rehabilitation Division with the State of Oregon's Department of Human Resources, interpreted Dr. Cogburn's report and noted the following functional limitations for Hanke:

1. Some hygiene issues.  Needs intermittent reminders.
2. Perfectionistic–no matter how long it takes.  Does not move on until ready.
3. Listens politely to directions, but does things her own way in the end–sometimes causes problems.
4. Long speech latencies; lack of affective expression.
5. Rigid
6. Withdrawn and introverted style; interpersonal relationships are not rewarding to her.

Tr. 747.  She repeated the diagnoses of Asperger's and Cognitive Disorders.

Hanke completed a computer skills course in May 2010.  The teacher noted Hanke seldom made mistakes, and when she did they were minor.  However, because Hanke wanted to be perfect, no matter how long it took, Hanke could have trouble succeeding in the workplace.  In addition, the teacher commented on a few problems with Hanke's personal hygiene, requiring that she go home to correct the problem.

Hanke's mother completed a Function Report in June of 2008, during the time she cared for Hanke and while Hanke was living in her home.  She reported Hanke had no trouble getting along with family, friends, neighbors or others, that Hanke could pay attention as long as necessary, and that she followed written and spoken instructions well.  She also wrote that Hanke got along well

with authority figures, and had never been fired or laid off because of problems getting along with others, but that her hygiene was poor.  Specifically, "Coriena could get along with people well, but they don't like her much because she smells and she won't keep her body and clothes clean.  She gets sores from not being clean."  Tr. 238.

At the hearing, sister-in-law Patricia Hanke testified that she hired Hanke to deliver newspapers which, according to other documents in the record, would have been around late-1999 or 2000.  Hanke had to arrive at the office by 3:00 a.m., stuff inserts into the newspapers, put each paper in a plastic bag, and deliver the papers via her car.  She had to be finished by 5:30 a.m. Patricia testified, "She couldn't get there on time.  She had to be told to bathe.  I had complaints from my other carriers.  I'd have to pull her into the office and have to tell her to bathe.  She didn't bathe she didn't have a job.  I had to call her in the mornings to get her there."  Tr. 38.  Patricia had to provide a wake-up call about eighty percent of the time, and then Patricia or an assistant would begin inserting and bagging Hanke's papers for her.  Hanke would not be done delivering her papers until 6:30 or 7:00 a.m. if Patricia did not help her.  Patricia testified that Hanke would bathe, then wear the same clothes through the whole week until Patricia told her to bathe again.  Hanke's feet started bleeding because she did not change her socks.  Patricia testified that her boss held onto Hanke because "he liked her and he felt bad for her and he didn't know where else she would go to work. I held on to her because she's my sister-in-law.  If I fired her, that meant another family member had to pay her bills, so I held onto her."  Tr. 42.

Hanke testified that she did not shower or change her clothes more frequently because of the hours of the newspaper delivery job.  She said she now showers about once a week, and changes her clothes every few days, without anyone reminding her.  She also testified she had trouble getting to

work on time at other jobs before the Oregonian, but she couldn't remember which ones.

## DISCUSSION

### I.    Severe Impairments

Hanke argues the ALJ erred by not considering her Cognitive Disorder a severe impairment, thereby failing to include her processing speed limitations in her residual functional capacity ("RFC") assessment.  Hanke contends her Cognitive Disorder affects her decisions about hygiene (as does her Asperger's), her timeliness, her processing speed, her ability to concentrate, and her long speaking delays.

Dr. Cogburn and Dr. Ude diagnosed Hanke with Cognitive Disorder, in addition to Asperger's.  The ALJ recognized Hanke's different mental illness diagnoses, but referenced the June 2010 diagnoses of Asperger's Disorder "accompanied by a specific weakness in the area of processing speed, with average intellectual capacity and aspects of obsessive compulsive personality features."  Tr. 19.  Since the ALJ identified a psychological impairment, whether by the name Asperger's, Cognitive, or Schizoid Personality Disorder, I address below only whether the ALJ adequately captured all of Hanke's limitations associated with her psychological impairments.  See Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007) (step two error harmless if ALJ considered limitations at step four).

### II.    Lay Witness Testimony

The ALJ summarized Patricia Hanke's testimony and found her "credible in describing her observations in a particular situation and during a specific period of time.  Conversely, this description does not concern employment which might better suit the abilities and limitations of the

claimant." Tr. 21.  With respect to Edith Hanke, the ALJ noted she completed the form only about 8 weeks after Hanke's car accident.  The ALJ found Edith Hanke credible "but the restricted level of functioning is not the claimant's normal state."  Id.

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness.  Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. 2006).  "[W]here the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination."  Id. at 1056.

The ALJ found both witnesses credible, but neglected to consider their complete statements. In Edith Hanke's case, the ALJ failed to discuss Hanke's hygiene issues which existed prior to her accident.  Furthermore, although Patricia Hanke's testimony about Hanke's inability to accomplish tasks within the required time may have been limited to the particular job Hanke performed, her testimony about Hanke's timeliness and cleanliness issues were not restricted to the newspaper delivery job, or to that particular time in Hanke's life, as I discuss below.  The ALJ failed to give adequate reasons to disregard these portions of the lay witness statements.

III.    Residual Functional Capacity

RFC "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis," meaning eight hours a day, five days a week, or equivalent.  SSR 96-8p.  RFC is the most a person can do in spite of limitations or restrictions.  Id.  "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the

medical and other evidence." Id.  Additionally, hypothetical questions posed to a vocational expert must specify all of the limitations and restrictions of the claimant.  Edlund v. Massanari, 253 F.3d 1152, 1160 (9th Cir. 2001).  If the hypothetical does not contain all of the claimant's limitations, the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy.  Id.

Setting aside Hanke's complaints about the ALJ's description of her processing limitation–"where accuracy is valued more or [is] more important than speed"–and her arguments about her inability to perform the jobs of Surveillance System Monitor and Escort Driver, her argument about timeliness and hygiene issues requires remand.

Although the Commissioner contends the ALJ chose a competing, but equally possible, interpretation of the record, the evidence from all quarters is that Hanke is unable to arrive at work punctually and in an appropriate condition.  The evidence reflects the following:  Hanke was fired for being late at her J.C. Penney job; her sister-in-law had to call her to get her to work on time delivering the Oregonian; she was on time for only one psychologist's appointment and it was one her mother brought her to; Hanke repeatedly reported she did not bathe regularly; her sister-in-law threatened Hanke with loss of employment unless she bathed, co-workers complained, and Hanke's feet bled from dirty socks; her mother commented on Hanke's lack of bathing and resulting sores prior to the accident; Hanke's father was concerned about Hanke's hygiene and believed she had lost jobs over it; her computer skills teacher noted Hanke needed to be sent home because of hygiene issues.  Finally, Hanke's only successful substantial gainful activity occurred fifteen years ago, and the intervening years have found her at a highly accommodated position delivering newspapers and as a Salvation Army bell ringer for a few weeks during the Christmas season.

Hanke's attorney asked the VE whether a worker would be able to work even if she were "unable to maintain acceptable standards of hygiene on a routine basis." Tr. 60. The VE answered no. The VE also confirmed that if the worker were bathing or changing clothes once a week, that would be below acceptable levels of hygiene.

The ALJ's residual functional capacity determination was incomplete and, as a result, so was the hypothetical question to the VE. The court has the discretion to remand the case for a finding of disability "where no useful purpose would be served by further administrative proceedings and the record has been thoroughly developed." Hill v. Astrue, 698 F.3d 1153, 1162 (9th Cir. 2012) (quoting Swenson v. Sullivan, 876 F.2d 683, 689 (9th Cir. 1989)). Although the "proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation," remand for further proceedings is generally called for where issues remain outstanding for resolution, and "it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated." Id. (citing Vasquez v. Astrue, 572 F.3d 586, 593 (9th Cir. 2009)). Because there is testimony from the VE that the limitations identified above, and which should have been incorporated into the ALJ's hypothetical, would preclude work in the national economy, this is the rare case where a finding of disability is warranted. See, e.g. Harman v. Apfel, 211 F.3d 1172, 1180 (9th Cir. 2000) (describing remand for finding of disability in cases where VE testified regarding limitations).

///

///

## CONCLUSION

The decision of the Commissioner is reversed.  The case is remanded for a finding of disability.

IT IS SO ORDERED.

DATED this ____6th____ day of March, 2013.

 /s/ Garr M. King_____
Garr M. King
United States District Judge